## Case No. 2,041.

BROWNING et al. v. BAKER et al.

BAKER et al. v. BROWNING et al.

The AROMA MILLS.

[2 Hughes, 30.] [1]

District Court, E. D. Virginia. March 27, 1875. [2]

SALVAGE—WHO MAY BE SALVORS—CHARTER PARTIES—LIABILITY OF CHARTERER — DISTRIBUTION OF SALVAGE.

1. Where a wrecking company charters a steamer for a wrecking enterprise, and the steamer is lost in prosecuting her work and left derelict by her crew, and then the wrecking company succeeds in saving her. *Held*, that under the circumstances of this case the wrecking company are entitled to salvage.

2. *Held*, also, that the charterers in this case were bound only to ordinary diligence, as bailees for hire, and were not responsible for accidents caused by vis major.

3. *Held*, also, that as the persons personally engaged in saving the steamer in this case were all on wages paid by the wrecking company, and have made no claim of salvage, and acquiesce in the claim of the wrecking firm, the whole salvage may be awarded to the wrecking firm.

In admiralty. Browning & Brothers, owners of the steamer Aroma Mills, libel the firm of B. & J. Baker & Co. for compensation for damages sustained by their vessel in the service of the respondents as wreckers. B. & J. Baker & Co. libel the steamer Aroma Mills, lost while wrecking off Cape Henry, for salvage for saving her. [Decree for libellants Baker, and libel of the owners of the steamer dismissed.]

W. H. C. Ellis, for Browning & Brothers.
Charles Sharp, for B. & J. Baker & Co.

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

[2] [Affirmed by the circuit court (case not reported).]

HUGHES, District Judge. Towards the middle of February last the brig Kewadin was wrecked on the beach immediately south of Cape Henry; she had a cargo of sugar, in boxes of about three hundred pounds each. News came of the disaster to the wreckers, B. & J. Baker & Co., at Norfolk, on the 15th of that month. Mr. Joseph Baker, of that firm, immediately sent for Captain Joseph Brown, master of the steamer Aroma Mills, 84 tons, of Camden, N. J., then in Norfolk, to come to see him at his office at Ferry Point. He told Captain Brown of the news he had just got, and said there was another job for him. Captain Brown had been about Norfolk for some time, and had recently assisted the Bakers in several wrecking enterprises, at $35 a day for his steamer and crew, consisting of three other men, aided by Captain Simmons and other persons furnished by the Bakers in addition to his own crew. On being sent for on the 15th of February, Brown consented to engage again and asked for Simmons. Mr. Baker suggested Captain King, but Brown preferred Simmons, as they had always done well together before. After some little while Simmons was found and was again engaged by the Bakers for this occasion. The reason of Brown's insisting upon being accompanied by Simmons was that he knew nothing of navigation outside of the capes, or of wrecking, and did not feel competent to direct the steamer's movements on the coast, in the enterprise they were to engage in. Simmons went along, not, it would seem, in the character of full master of the vessel, but as commander of her, and agent of the Bakers, in whatever appertained to the wrecking operations. Nothing was said, on this particular occasion, of compensation, or other terms. There was no written charter-party, and no oral one. Each party understood that the service was to be similar to that which had been rendered by the Aroma Mills on recent occasions; that the terms of compensation were to be the same; and the relations of Simmons to the steamer the same. The service was of course to be more or less hazardous to the steamer; and on a former occasion Captain Brown had endeavored to insure his vessel in some office at Norfolk, but without success. He had had some conversation after doing so with Mr. Joseph Baker about that firm insuring his vessel, in which Mr. Baker had indirectly refused by mentioning a rate so high that Captain Brown had dropped the subject. A hoisting steam engine was put on board the steamer before she left Norfolk, to be used for wrecking purposes. No objection to this was made by Captain Brown. On several former occasions the Aroma Mills (having no hoisting steam engine of her own) had taken one on board from the Bakers, and had, while unloading wrecked vessels (the San Marcos at False Cape, among others), used the hoisting engine on board her own deck in hoisting cotton from the wreck,

for some twenty days in succession. (See evidence of libellants' witness, White.)

The steamer left Norfolk on the 15th. She lay at Old Point wharf most of the time waiting for suitable weather until the morning of the 17th. She then went out of the capes and reached the brig Kewadin between 8 and 9 o'clock, a. m. The water was smooth enough to admit of her going alongside, which she did in a short time early in the day. Captain Simmons had ordered the fire in the hoisting engine to be made up. The brig was lying bow to shore and stern to anchor east from the shore. The steamer was put alongside, her bow to the brig's stern, with anchor to northeast of the brig. Captain Brown preferred that the hoisting engine should be put at once on the brig that morning, and so did Captain Simmons. But Captain King, another employé of the Bakers, who was master-wrecker of the brig, and as such had the direction of all proceedings, determined to let the engine remain on the steamer and to use it there. His reasons for this course were: 1st, that two hours would be lost in putting out fire, cooling off the engine for handling shifting it to the brig and rigging the purchases there for hoisting the boxes of sugar; 2d, that the purchases for shifting the engine were found to be too short for the purpose; and 3d, that he was expecting the Bakers to send him down that day from Norfolk another hoisting engine to be put on the brig. All hands were engaged all day in transferring boxes of sugar from the brig to the steamer, until after 9 o'clock at night. Some time before night, Captain Brown requested Captain Simmons to have the hoisting engine shifted to the brig, his object being to be ready to leave for Norfolk when night came on. But Captain Simmons replied that Captain King would shift it when he got ready. Making the best of the good weather, and working very hard all day, they had taken three hundred and fifty boxes of sugar on board the steamer by between 9 and 10 o'clock at night, when a sudden wind struck down from the nor'-nor'east, and all work was suspended. Then the task of shifting the hoisting engine from the steamer to the brig was commenced. In doing so the same tackle was used that had been habitually used for taking in the brig's anchor, weighing some 1,500 pounds. The hoisting engine weighed by estimation some 1,800 or 2,000 pounds. One of the libellants' witnesses testified that he had seen this same hoisting engine lifted "with just such a sized line" as was then used. In lifting the engine the wind blew very strong, the sea rolled heavily, a party of men was heaving to anchor on the steamer at the capstan, and the deck of the brig was considerably more elevated than the deck of the steamer. From some of these causes the purchases used for lifting the engine were subjected to extraordinary strain, besides that of its mere weight, so

that while lifting the engine something "parted," and it fell back upon the deck of the steamer, on her coal-bunker, and covered it. One of the libellants' witnesses says that it was a "snatch-box" (I suppose one of the pulleys rigged with a hook) that broke, and not a rope. By this time the storm had increased considerably, and the sea had become rough.

The attention of those in control was now directed to getting the steamer clear of the brig, so that she could get away, carrying the hoisting engine along with her. It would seem that the only object of putting the hoisting engine aboard the brig had been that it might be used in further discharging her cargo, and in getting her off the beach. This object was of course relinquished, after what had happened. The hoisting engine had fallen on the coal-bunker and prevented it from being covered, so that afterwards water went in through the bunker-hole. No effort was, at once or at any time, made to remove the engine from the bunker and close the opening. One of the libellants' witnesses, Stephen Bell, testifies that two men could have slided the engine off the bunker; that he and three more could have moved it off by prizing. It does not seem, therefore, to have been deemed important to remove the engine. Except the delay which had been incurred in trying to shift it, which delay itself may have been a remote cause of the disaster afterwards happening, in view of the increasing violence of the storm, nothing connected with the engine had any influence upon subsequent events; and the voluminous evidence · in the case respecting this article is of little moment. To ascribe the subsequent wrecking of the steamer to the fact that this hoisting engine lay on the bunker, would be to impute to all concerned in the care of her the ʻmost shameful imbecility.

In trying to get away from the brig the steamer had moved forward until her stern was within twenty feet of having passed the stern of the brig, all hands heaving at the capstan to her anchor chain; but the strong ebb tide, and possibly the wind made that a difficult task, and carried her bow considerably around towards the cable which stretched out from the rear of the brig to the brig's anchor; and also, when the steamer finally cleared the brig, and swung to her own anchor, caused her stern to sweep around against the brig's cable. Orders were given by Captain King and passed to the pilot and engineer on the steamer to go ahead; and to the men on the stern of the brig to pay out the cable, so as to let it sink low enough to clear the steamer's propeller. Thirty fathoms of cable were thus paid out; and that not being enough, a hawser was bent on to it and forty fathoms of hawser were paid out in addition. In paying it out the bent-on end of the hawser caught in the chock of the brig for a mo-

ment, making it slip. Captain King with a few men thereupon got into the surf-boat to underrun the cable and make sure this splicing, thus causing some delay. The strong ebb tide that was sweeping past caught the cable and prevented it sinking to the bottom when paid out. From these causes it happened that the propeller of the steamer fouled upon the cable and could not be moved. Captain King then with the men in the surf-boat made a fruitless effort to underrun and loosen it, which lasted some time; but the attempt was finally given up, and then it was determined to cut the cable, which was hung upon the propeller. When this was done the steamer swung to the brig's anchor at the end of the cable, stern to. She was thus hung to her own anchor, and that from which the brig had been cut loose, at a distance of some sixty fathoms from the brig. The condition of the brig thus losing her anchor cable made it necessary for Captain King and the men who were with him in the surf-boat to go to that vessel. The only chance of getting aboard of the brig in the heavy sea and storm was by means of the end of the hawser which had been cut. As the steamer had no surf or other boat all of her crew, including Captain Brown and Captain Simmons, left her, and went to the brig on Captain King's surf-boat, abandoning the steamer and leaving her derelict. They reached the brig about 1 ,o'clock a. m. In general, in these transactions and occurrences since the morning of the 17th, Captain King's had been the directing mind, and his authority had been deferred to by all. I do not see, however, that he assumed to give orders or to assert control except in matters connected with the wrecking operations, and in such matters as it was incumbent upon him to exercise authority in as master of the brig Kewadin. I see no evidence that he assumed command of the steamer; and when his surf-boat finally left her, he did not order the crew of the steamer to get on board of it, but, clearly indicating that they had better do so, called on all who intended to go to the brig to come aboard.

The evidence is that the rain had been for several hours falling and freezing on the men as it fell, who, if they had been obliged to remain on the deck of the steamer, may have perished with cold; that the steamer was bumping against the bottom of the beach, and if a hole should be made, would founder; and that the only chance for her crew if she should founder, would be to make the shore on sugar-boxes and spars. Yet the result proved that they need not have left her, nor is it certain that they could not have got below deck. I think the general judgment of mariners upon the case would be that they left their post of duty without necessity.

A few hours after the steamer was thus abandoned, at about 5 a. m., the propeller

chafed apart the cable on which it had been caught, and the steamer then swung again to her own anchor, and dragged it south along the beach for three-quarters of a mile, until she stranded, on the morning of the 18th. She laid nearly broadside on, and continued so to do until the salvors undertook to get her off, on the 19th of February. She sank in the gully in which she was afterwards found lying, within twenty-four hours after stranding. On the 19th of February, she was boarded by Captain Chase, of the brig Sabra, acting under Captain Barney Baker. She was then lying broadside to the beach, sunk level with the sea, with the water breaking over her so strong as to render it impossible for a man to stand on deck. Captain Chase got a hawser fast to her and took it ashore, and rigged up purchases on shore. By this means he, with eight men, pulled the steamer around and hauled her up so as to allow of pumps and gear being put aboard for pumping her out. This work and that afterwards done by the steamer B. & J. Baker, occupied about the period of eight tides. On the morning of the 21st, the weather having moderated, the wrecking-steamer B. & J. Baker, owned by the firm of that name, came abreast of the Aroma Mills about 6 o'clock, and found the tide too high to put a pump on her at that time. By 10 o'clock the tide had fallen enough for raising shears on her, which was done, and by 4 o'clock p. m. the powerful pumping-engine belonging to the wrecking-steamer was got ready for work. Meantime, other men were battening up the leakages that had been made in the Mills. By the next low tide, which was about midnight, they got the pumping-engine to work, and the vessel was pumped clear of water by daylight of the 22d. A line was then run from the Mills to the Baker, with which the Mills was got afloat about 9 o'clock in the morning. On the 22d she was towed to the Rip Raps, and a few days afterwards brought up to Norfolk. The sugar in the 350 boxes which had been taken from the Kewadin had nearly all melted. Of the whole quantity, only 150 boxes were afterwards found still to contain sugar. She was also found to have shipped a good deal of sand while stranded. The opinion of all the wreckers was that continued bad weather would have sunk her deeper and deeper in the sand, and made her in a short time a hopeless wreck. She remained in possession of the Bakers, under claim of salvage, until the 20th of March, and was then, by order of court, hauled upon the ways in Norfolk, in order that the amount of damages she had suffered might be ascertained. This appears, from the survey made by order of court, to have been about $1,700. The evidence authorizes me to assume that she cannot be put in complete repair for less than $2,500; that the permanent irreparable injury suffered is not less than $2,500; and

that her value before the disaster was $15,000; and that her present value is $10,000 or, when repaired, $12,500. I have thus given the facts of the case so far as they appear to me to bear upon the legal rights of the parties and the legal principles of the case.

A libel in personam is filed by Browning & Brothers against B. & J. Baker & Co., claiming compensation for damages to their steamer while in the service of the respondents. A libel in rem is also filed by the Bakers against the steamer for salvage, and the two libels and the answers are heard together by consent. The two questions for decision are: 1st. Are Browning & Brothers entitled to compensation for the damages suffered by the steamer? And 2d. Are the Bakers entitled to salvage for saving the steamer after she was wrecked? The difference involved between the claims of the litigants on either side is some $600.

First, as to the claim of Browning & Brothers. The contract which was made between Brown, master of the steamer, and Joseph Baker, was a contract of hiring. It falls within the class of bailments for hire and delivery of the chattel to the bailee. That there was a complete delivery, however, is not conceded. At most, it can only be claimed that the delivery was partial. The partial command exercised by Simmons was analogous, in some respects, to that of a pilot; in other respects to that of a supercargo; and, in fact, was the command of a wrecking-master, in charge of a wrecking-vessel, on a single wrecking enterprise; the master and crew of the wrecking-vessel being on board, and the master being still in command as to every matter concerning the vessel not pertaining to the business of wrecking. Therefore, the delivery was not perfect or complete. The case was that of a bailment for hire, and partial delivery. Nevertheless, for the sake of the argument, I will assume that the delivery was complete and that Simmons was absolute master of the Aroma Mills for the occasion, subject to the direction, while wrecking the Kewadin, of the wrecking-master of that brig, Captain King, who and his crew were also employes of the hirers of the Aroma Mills.

The law of this case is the same as under the common law in cases of hiring and delivery, except so far as the rules of common law may be modified in application by the principles of admiralty. The general rule of the common law is that the bailee is bound to take all ordinary care of the chattel, but that the owner must take the risks to which the chattel is naturally liable in the service for which he knows it is to be employed, but not the risks occasioned by want of ordinary care on the part of the hirer; that this care is relative and must be in proportion to the demand for it; that if the thing hired is lost or injured by superior force or inevitable casualty, without any

fault of the hirer, or if the loss is not strictly inevitable and there is reasonable diligence on the part of the hirer, he is exonerated. For some time it was contended by very eminent legal authorities that the bailee, in a bailment for hire, was bound to the utmost vigilance. But this position is long ago given up, and the law is well settled that he is bound to only ordinary diligence. By ordinary diligence is meant that which prudent men use, which the generality of mankind use, in managing their own chattels of the same kind. The damages happening to chattels while so used, fall on the owner and not on the hirer. The authorities on this subject are too numerous for citation. They may be found in Addison and other authors on contracts, and Story on Bailments in the first five articles of chapter vi.'

The question, therefore, on the claim of the Brownings for the damages sustained by their steamer, is simply the question whether the disaster happened to her by want of ordinary care or by negligence on the part of the Bakers, through their agents, Captains Simmons and King. I do not think there was any negligence on the part of those men. I do not think there was a want of ordinary care on their part. On the contrary, I think they did their duty on the occasion of the disaster to the steamer manfully and faithfully. We can see now, after the event, how, if they had done otherwise than they did in one or two respects, the disaster might not have happened; but there are few accidents, whether of the slightest or of the most disastrous character, which ever happen, in which we cannot see after all is over how they might have been averted. But all the witnesses in this cause unconsciously speak of each misfortune which led to the final disaster as accidental. The direct cause of each of these accidents is declared by them all to have been the sudden storm which struck down from the nor'-nor'-east when not a soul was expecting it. If they had foreseen it, they concur in thinking all would probably have gone well. But none of them foresaw the storm, and from the moment it struck them it began to produce delays and accidents which the bravery, perseverance, and zeal of the two crews were ineffectual to avert. The storm which came down so suddenly, and which continually increased in violence until morning, and did not subside until the 21st instant, was the vis major, the "superior force," which, in spite of those stout, earnest wreckers, caused first the accident to the hoisting-engine, next the accident to the propeller, then the abandonment of the steamer, and, finally, her stranding upon the beach. These were just the sort of accidents which ship-owners insure against, which these hardy wreckers could not avert, and for which I do not think the Bakers are responsible. If they are responsible to the Brownings, then Captains King and Simmons would have been so if acting for themselves, and if this libel had been brought against them; but such a claim against these two men, founded upon the evidence in this case, would strike me as too unjust to be entertained by this court. Loss is always a hardship. Here it is a grievous one. But it must fall somewhere; and the law after veteran, multiform experience in dealing with bailments for hire, has settled upon the policy of leaving it upon the owner when the hirer uses due care.

2. The next question is, as to the right of the Bakers to salvage. The question is anomolous. I know of no reported case in which, where a wrecking vessel is itself wrecked in prosecuting her work, claim of salvage has been made by the wreckers who were charterers of the lost vessel. Finding that I must make a precedent, I have examined the authorities on the subject with care. As a matter of public policy, reason would suggest that a court of admiralty should discourage libels for salvage by wreckers against valuable vessels (steamers especially) which they had chartered for wrecking purposes, and which were lost in their service. Wreckers have acquired the character of grasping, unscrupulous, remorseless men. It is not material to the matter in hand that the class may have done so, for I believe the wrecking firm who are party to this cause are highly useful citizens, and men of character and standing. If it were the policy of the law to deny salvage in cases of this sort, in order to prevent careless treatment by wreckers of wrecking vessels in their employment, the reason of the policy would cease in this case, because the wreckers lost far more by the disaster which overtook the steamer than they can gain in salvage for saving her. The sugar lost on the Aroma Mills, and the peril to which the Kewadin was subjected by cutting her cable in the effort to save the Mills, were too great to admit of the thought that the Mills was wilfully allowed to strand. I am bound to exonerate the Bakers from any imputation on which the policy of the law discouraging such libels must be founded. The question of their right to salvage in the present instance stands simply upon the merit of their claim as salvors.

The principle of the admiralty is, that there is no limitation to the kind of persons who may be entitled to this compensation. Under special circumstances any person may be a salvor. They may be persons in public employment on board men-of-war. See [U. S. v. The Amistad] 15 Pet. [40 U. S.] 518; 3 Hagg. 14; 6 C. Rob. Adm. 293; 1 W. Rob. Adm. 172; Pritch. Dig. 385, and note; and many other cases. They may be semi-official persons, as pilots. See [Hobart v. Drogan] 10 Pet. [35 U. S.] 108, and 2 Hagg. 270. They may be insurance (or Lloyd's) agents. See 3 Hagg. 370. They may be persons having some relation to the

ship, as passengers, and the crew, in extraordinary circumstances. See 1 Hagg. 227; 2 Dod. 433; and Pritch. Dig. 389, note 62. They may be any sort of persons, as women, apprentices, boys, slaves, masters, mates, sailors, cooks, surgeons, carpenters, and landsmen of every national character. See [Mason v. The Blaireau] 2 Cranch [6 U. S.] 240, 270; 2 Pet. Adm. 278, 282, 284 [Bell v. The Ann, Case No. 1,245]; and 2 W. Rob. Adm. 186. It is the circumstances under which the service is rendered, not the character of the persons, that determine the right. Neither is it material what may be the character of the assistance rendered, or what the kind of peril, or what the cause of loss. Whenever the vessel, from whatever cause, per fas aut nefas, is lost or falls in peril, then the right of the salvor to save her commences, his right of reward being contingent only upon success. Moreover, salvage service is highly favored by the law, in all commercial countries, from motives of clear public policy and regard to the interests of commerce. 1 Ware, 477 [The Etna, Case No. 4,542]; 2 Ware (Davies), 61–66 [The Emblem, Case No. 4,434]; 1 Sumn. 328 [The Boston, Case No. 1,673]. It will be rewarded willingly and liberally—not grudgingly. Salvage is the compensation due to persons by whose voluntary assistance a ship has been saved to the owner from impending peril, or recovered after actual loss. Ben. Adm. § 300; Abb. Shipp. 554; Gilp. 60 to 66 [Hand v. Elvira, Case No. 6,015]. These being the general principles of law respecting salvage, there can be no doubt that under the facts of this case, the owners or charterers of the brig Sabra and the steamer Baker were entitled to salvage for saving the Aroma Mills. This right as against Bakers & Co., who were owners and charterers, could only be defeated by two circumstances: 1st, of their being in such a relation to the Aroma Mills that their saving her was not voluntary, but a duty; and 2d, of a share of the salvage belonging to those of the crews of the two wrecking vessels who engaged in saving the Mills.

1. There is no doubt that in the present case there was abandonment of the Mills by her master and crew sine animo revertendi. The steamer was derelict. She was in imminent peril of hopeless loss. Another day of storm and wave while wallowing in the sea gully within the reef, would have sunk her down in the sand, filled her with sand, and rendered her recovery hopeless. Under these circumstances, although in general the law denies salvage to a vessel's own crew, even the steamer's own crew would have been entitled to salvage if they had saved her. Yet it cannot be pretended that the fiduciary obligation of a charterer to a vessel on board of which he may never have set foot, is greater to save her than that of the vessel's own crew. In legal contemplation, it would have been a voluntary act on the part of her

crew to save this steamer from a speedy burial in the sand of the sea on the 21st February. It was still more clearly and emphatically a voluntary act, not impelled by duty, in the charterers, through their agents, to save this vessel. I am clearly of opinion that the Bakers, as owners of the steamer bearing their name, and as employers of the crew of their chartered brig, the Sabra, are entitled to salvage.

2. The only question left is, as to how the claim of the Bakers to salvage is affected by that of other persons entitled to salvage, if any there be. Salvage is not a payment due on implied contract, but a reward for extraordinary service and risk. In general, salvage service is personal, and the reward is due immediately and only to the persons actually rendering it. So far is this principle carried, as an incentive to personal daring, that a minor is entitled personally to the reward, and his father can assert no claim to it. Yet owners of property risked in salvage service are entitled. But in the interest of commerce, since the employment of powerful mechanical appliances for saving wrecks, this rule has been relaxed. The owners of steamboats especially, which are become so extremely useful and efficient in wrecking operations, and which are structures whose cost is beyond the ordinary means of individuals, are now allowed a liberal share of salvage money, although the owners may be a numerous firm. The salvage is given to the owners of salving vessels in compensation for risking their wrecking vessels in hazardous services. And in [The Comanche] 8 Wall. [75 U. S.] 448, salvage was allowed to an incorporated company organized for chartering and hiring vessels and persons in wrecking enterprises. The English and American reports of admiralty decisions during the last twenty-five years are full of cases in which the owners of vessels engaged in wrecking operations, whether individuals or corporations, have been allowed salvage. They are too numerous for citation. Reference to some of them may be found in [The Comanche] Id. 473. In the case of The Comanche, incorporated owners were allowed salvage in the same manner as if they had been private persons; although the persons actually performing the service had no share in the profits of the company, but were hired and paid under permanent arrangements at liberal rates of pay. I assume, that in the case of the Aroma Mills the whole salvage due is conceded to the Bakers by all who were personally concerned in saving the steamer, and I feel authorized by the precedent of The Comanche and also of The Blackwell, 10 Wall. [77 U. S.] 1, to decree accordingly. If these persons were not bound by a contract with the Bakers, and had made claim to a share of the salvage due, I should have had no hesitation in allowing it.

I think the success of the enterprise was

due to the skill of the two crews working in the employment of the Bakers; and more especially to the efficient pumping and other machinery of the steamer B. & J. Baker. I believe it is in evidence that the Bakers offered to compromise their salvage claim at a certain amount in order to avoid this litigation. Their offer having been rejected, and the parties being here on their own rights, I am not limited by the amount proposed in compromise, but shall award two-fifths of the value of the Aroma Mills as she was when saved and towed into this port, to wit, $9,000; subject to a proper deduction of what was due on the hiring, up to the time that the steamer was abandoned, on the night of the 17th February. I shall allow fifteen days for an appeal to the circuit court, sitting at Richmond, and direct a stay of process meantime.

NOTE [from original report]. The decree was affirmed on appeal by the circuit court [case unreported].