## JACOBSON et al. v. PANAMA R. CO.

(Circuit Court of Appeals, Second Circuit.   May 12, 1920.)

No. 209.

1. **Salvage ⊚=38—Award to crew within discretion of court.**
   An allowance to the crew of a salving vessel of one-fourth of the award of $2,000, for releasing a steamship stranded on a reef, the work consisting chiefly in lightering her cargo and afterward reloading the same, the greater part of the work being done by others than the crew, *held* within the discretion of the court, where the sea was calm and the services attended by no danger.

2. **Salvage ⊚=18—Common ownership of vessels does not deprive crew of right to pay for salvage services.**
   That both salving and salved vessels were being operated by the Emergency Fleet Corporation *held* not to deprive the crew of the salving vessel of the right to compensation for salvage services.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by Edward Jacobson and others against the Panama Railroad Company.   Decree for libelants, from which they appeal. Affirmed.

Silas B. Axtell and Arthur Lavenburg, both of New York City, for appellants.

Richard Reid Rogers, of New York City, for appellee.

Before WARD, ROGERS, and MANTON, Circuit Judges.

MANTON, Circuit Judge.   The libelants were members of the crew of the steamship Neptunas.   Suits were brought by the officers and members of the crew of this steamship for salvage services to the steamship Panama on July 1 and 2, 1918, when the Panama went aground at Rochelois Reef on June 29, 1918.   This is about 50 miles west of Port au Prince and about 10 miles from the island of Haiti. The District Judge awarded $2,000 to the steamship, $500 of which was to be paid to the entire crew of the ship Neptunas.   About 19 members of the crew were represented by the proctor for the present appellants, and 9 other members of the crew were represented by another proctor.   Each proctor instituted separate suits.   They were consolidated and tried together.

[1] The appellants contend that the allowance to the members of the crew was inadequate for the services performed.   The place where the vessel went aground was on a soft bottom of coral sand, and the record indicates there were no rocks within 500 feet.   Where this reef is located, Gonaives Channel, there is an inland sea.   It was about 7 miles from land on either side.   When she grounded, she was drawing about 22½ feet of water and was about one-third of her length from the bow ground, and about 20 feet of water under her bow. The colonel in charge of the Marine Corps Station at Port au Prince sent the Potomac to her relief, for the purpose of taking off some of her cargo.   On the same day, the ship Gorgas, of 4,564 gross tons and

⊚=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

owned by the appellee, appeared in the vicinity and stood by until 4:15 in the afternoon, when it was decided to transfer the cargo from the Panama to lighters brought to the point by the Potomac. This course was selected, rather than transferring it to the Gorgas. The weather was clear during the time she was grounded, and according to Capt. Stone, of the Gorgas, she was not in danger of any passing storms. The Potomac was a powerful steam tug, and she brought with her a 250-ton lighter for the purpose of relieving the ship of her cargo. The log of the Neptunas records the following happenings:

"Monday, July 1, 1918, 4:45 p. m., hauled fast alongside stranded steamship Panama.

"6 p. m., commenced taking cargo; A-B's and ordinaries of Neptunas working cargo on steamship Panama.

"4 to 8 p. m., light airs; choppy seas; fine and clear.

"July 2, 1918. All day alongside steamship Panama.

"Remarks: 12 to 4 a. m.

"12, knocked off for lunch; 1 a. m., turned to, attempted to haul Panama off, without success.

"3 a. m., knocked off.

"4 to 8, light breezes; choppy seas; calm.

"7 a. m., turned to and lightening steamship Panama.

"A-B's and ordinaries from Neptunas working on steamship Panama.

"8-12, light airs, calm sea; fine and clear.

"12 to 4, calm, cloudy, and hazy.

"4 to 8.

"4:30 p. m., knocked off shifting cargo.

"4:35 p. m., full speed astern; Panama sliding off.

"4:45 p. m., hauled clear of Panama.

"4:50, full ahead for Port au Prince.

"Fine and clear; calm, smooth sea.

"8 to 12.

"11:15 p. m., half ahead.

"11:20, let go anchor Port au Prince. Light easterly air; choppy sea; fine and clear.

"July 3, 1918.

"At Port au Prince and alongside steamship Panama.

"The day began fine and clear; light southeasterly breeze.

"6:50 a. m., shortened up.

"7 a. m., anchor up, slow ahead.

"7:20 a. m., stopped.

"7:25 a. m., full astern.

"7:30, all fast alongside S. S. Panama.

"Crew employed painting side.

"3:30 p. m., commenced discharging cargo into S. S. Panama.

"1 a. m., knocked off discharging.

"The day ends fine and clear; light southwesterly breeze."

(It is noted that this log contains an inaccuracy, in that the entry of "1 a. m." does not apply to this day. It really applies on the following day commencing at midnight.)

"July 4, 1918. alongside of S. S. Panama, Port au Prince.

"1 a. m., knocked off discharging. This day begins fine and clear; light southeasterly airs.

"10:30 a. m., finished discharging. All cargo received at Rochelois Reef returned to S. S. Panama."

There is some conflict in the testimony as to just what the members of the crew of the Neptunas did, but it is clear that the Neptunas carried about 26 stevedores, not members of the crew, and that most of the work of transferring the cargo of the Panama to the Neptunas

was performed by these men, who were paid for their services, as well as by other stevedores who were brought out from Port au Prince. The members of the crew performed what, apparently, was their usual service under the direction of the captain of the Neptunas, except that 8 members of the crew came out and were put to work, some upon winches, and others upon two cranes, one working forward and one aft. They were engaged for from 5 to 13½ hours. They were paid at the rate of 60 cents an hour for this service; this in addition to the regular pay they received as members of the crew, and the record indicates that but one of the appellants performed such service. This was Boatswain Knudsen. An examination of the names, as shown by Exhibit B, demonstrates this.

The learned counsel for the appellants criticizes the findings of fact below, but upon examining this record with care we find no inaccuracy in the finding of any fact set forth in the assignments of error. The first assignment has to do with the service performed by the Neptunas. The Neptunas was of considerably lighter draft than the Panama, and it may be that she did assist in backing off with her, but at no time did she actually tow or attempt to tow the Panama. Lines connecting the Neptunas and the Panama were not towing lines, and they could not withstand any great strain, nor were they adapted for towing purposes.

On July 2 there appears in the log an entry showing an attempt made to haul the Panama off without success. The substantial work of getting the ship off was performed in unloading the cargo by the Potomac. The finding of fact of the District Judge as to storms of any violence, which he stated were rare at the place where the Panama went aground, is of no importance. The testimony, however, does indicate that people familiar with the locality discussed the Rochelois Reef as a place of refuge and safety in case of storm. It also appears that there is no record of severe storms. The testimony is ample that the weather was fair at the time the ship was aground. The service did not involve any danger, and it took but a short time.

It is fair to consider the value of the property in peril, the degree of peril, and the value of the property employed by the salvor, the risk of life or property incurred, the skill and dispatch shown in rendering the services, together with the foresight and skill used in the preparation to render it, the time consumed, and the labor performed by the salvor. The Blackwall, 10 Wall. 1, 19 L. Ed. 870. The courts do not desire to award so little as to discourage salvage aid, nor so much as to encourage unnecessary and extravagant statement of service. The No. 92, 252 Fed. 118. All these matters are within the sound discretion of the District Judge, who hears the facts and sees the witnesses. It is for him to correctly find the facts, and it is only if the evidence indicates an abuse of discretion that this court interferes. The Kanawha, 254 Fed. 762, 166 C. C. A. 208.

[2] The Neptunas was controlled by the Emergency Fleet Corporation, and both vessels were considered government ships, appropriated exclusively to public service. But, even though there was common ownership by the United States, this has been held not enough to de-

prive the master and crew of the salving vessel of compensation for salving services. Rees v. United States (D. C.) 134 Fed. 146. The members of the crew had an independent right accorded them by law for compensation for salvage. They are entitled to a maritime lien as protection. The New Orleans (C. C.) 23 Fed. 909. They may therefore maintain this action in personam to the extent of their lien for their services in connection with the Neptunas' services to the Panama. An allowance of one-fourth of the award of $2,000 to the crew is not such an abuse of discretion as would warrant our modifying the decree below.

Decree affirmed.