## THE ALABAMA.

## THE BRANDYWINE.

(District Court, S. D. Texas, at Houston.   March 14, 1922.)

### No. 1091.

1. **Salvage ⬳1—Service must be voluntary and to some extent effective.**
   To constitute a salvage service, for which recovery is allowable, it must be voluntary and to some extent effective.

2. **Salvage ⬳26—Elements determining salvage award.**
   The circumstances of danger and peril in which the salved vessel was, the imminence of that danger, and the necessity for immediate rescue therefrom, are to be considered in making a salvage award.

3. **Salvage ⬳26—Conditions at time of service important in making award.**
   In determining award for salvage services, the view which the persons engaged in the operation of saving and being saved took of the matter under the facts and circumstances then known to them is the important one, and not the view which might later be taken.

4. **Salvage ⬳26—Elements of salvage award include peril and injury to salving vessel.**
   Important elements in fixing salvage compensation are the perils to the salving vessel, the time consumed, and the efficiency and promptness of the service, and in addition the actual damage and loss to such vessel directly traceable to the salving operation.

5. **Salvage ⬳30—Amount of award considered.**
   A salvage award of $45,000, made to a steamship and a tug for services in releasing a steamship worth $1,000,000, stranded in the Gulf of Mexico and seriously imperiled by threatening weather, the steamship, which worked for more than two days under dangerous conditions and suffered actual injuries, repair of which cost over $17,000, being given $35,000, with $10,000 awarded to the tug, which arrived on the third day, and whose efficient help rendered the service successful.

6. **Salvage ⬳26—Actual damage sustained by salving vessel recoverable.**
   Where a salvage operation is accompanied by peril to the salving vessel, which in fact suffers injury, the item of recovery due to the peril may properly be measured by the actual damage sustained, if the amount is within a reasonable award for the service received by the salved vessel.

⬳For other cases see same topic & KEY-NUMBER in 'all Key-Numbered Digests & Indexes

In Admiralty. Suit for salvage by the Texas Company, owner of steamship Alabama, against the United States, owner of the steamship Brandywine. Decree for libelant and for intervening owner of the tug El Aguila.

Bigham, Englar & Jones, of New York City, and Mart H. Royston, of Galveston, Tex., for libelant.

H. C. Hughes, of Galveston, Tex., for intervener.

D. E. Simmons, U. S. Dist. Atty., of Houston, Tex., for respondent.

HUTCHESON, District Judge. About 10 o'clock on the morning of April 1, 1920, the Shipping Board's vessel Brandywine, bound for Pablo Blanco, a port about 16 miles south of Lobos Island, went aground on Medio reef just off of Lobos Island. The captain made every effort with his own power and anchors to come clear of the reef, but was unable to do so. The reef at this point was about 200 feet long and from 30 to 50 feet wide, and the vessel lay fully aground on the southeast portion of it.

The captain then commenced to use his wireless, and in response to such calls the Alabama, a Texas Company tanker, which was loading oil at Port Lobos, Mexico, suspended loading operations and came to the Brandywine's rescue, arriving at the place of grounding at 2 o'clock on April 1st, accompanied by the Texas Company's launch, Meteles. She immediately began her attempts to pull the Brandywine free. These attempts were persisted in, but unsuccessfully, until April 3, at which time the tug El Aguila, a large and powerful tug thoroughly equipped for salvage service, had come up, and, lines having been made fast to the Brandywine from both the El Aguila and the Alabama, the Brandywine came off clear, except as to her anchors, at 12:14. At this time the lines of the El Aguila were parted, but the Alabama continued to hold on and prevented the vessel from going back on the reef. The Alabama continued to pull until 3 o'clock, when the anchors came clear, and all lines were let go and the Brandywine steamed away, having suffered no damage.

During the course of the operations the Alabama grounded, and as was subsequently ascertained suffered damage to her plates which required her being laid up for several days for repairs, which actually cost $17,000. In addition the Alabama sustained other expenses, for surveying, loss of hawsers, demurrage for several days, which made the salving operation cost her in actual money loss, in excess of $17,000. I find that this damage to the Alabama was not caused by her fault, but was an incident to the service under the circumstances.

During the time of this salving operation the barometer commenced to fall, and after the Brandywine went aground it became apparent on shore that a norther was blowing up. When the captain got the information from the shore that a norther was coming, he commenced to send urgent wireless messages for help. Among those answering was the Shipping Board's ship Rheems, which advised that it would reach Medio reef at 5 o'clock, April 3. While the Glenpool wired:

"As you have assistance and I will be running a big risk, drawing 28 feet, I do not think I am justified losing any more time."

The barometer on April 3 was low, registering 29.50, and on the 4th there was a strong wind from the northwest, with a very heavy sea.

The Alabama asserts her right to salvage award in which she includes, the damage and loss sustained by her, and the El Aguila claims a salvage award based upon the efficiency of her service. The United States, for the Brandywine and the Shipping Board, admits that salvage service was rendered, but denies that the Alabama sustained damage from the salvage service, and further denies her right to recover therefor, if she did sustain damage, and asserts that the service of both vessels was of a nature which would justify only a small award.

[1] To constitute a salvage service, it is essential that the service for which claim is made be voluntary and to some extent effective. If these two elements exist, a recovery is allowable. If there is a failure of either to exist, there is no allowable recovery.

[2] These two principles constitute the skeleton which supports the body of the salvage law. Granting these, the amount of the award depends upon other circumstances, the value of the vessel salved and of the salving vessel, the circumstances of danger and peril in which the salved vessel was at the time of her rescue, the imminence of that danger, and the necessity for immediate rescue therefrom; and these are to be judged, not in the light of subsequent, but in the light of the then transpiring events.

[3, 4] In short, the view which the persons engaged in the operation of saving and being saved took of the matter under the facts and circumstances then known to them is the important one, and not the view which might later be taken. Other important elements of salvage are the perils to the salving vessel, the time consumed, and the efficiency and promptness of the service. The efficiency, through proper equipment, to a large extent, offsets the absence of danger which often attends salving enterprises where the salvor is not properly equipped. In addition to these elements, as some courts say, or included in them, as others put it, is the actual damage to the salving vessel and the loss and injury directly traceable to the salving operation.

[5] In the case at bar the following elements are established overwhelmingly: First, that the Brandywine was in peril. That the Master of the Brandywine felt that the peril was imminent and great is abundantly shown by the wireless messages passing from ship to ship and from ship to shore. Second, that the Alabama volunteered and in every way within her power endeavored to effect the salvage. Third, that the position in which the Brandywine lay on the reef made attempts to salve her attendant with danger to the salving vessel. This is shown by the fact that the Bonita refused to approach the reef close enough to render assistance, and is put beyond peradventure by the fact that the Alabama scraped in the operation which she performed. The evidence shows that the Alabama's services were persistent and faithful, and, had her equipment been of the kind which the service needed—in short, had the efficiency measured up to the other elements present—she should, in view of the admitted value of the Brandywine, to wit, $1,000,000, receive a very substantial award. The fact that she struggled for three days to perform the operation, and then did not

perform it, except through the assistance of El Aguila, must, of course, diminish the return to which she is entitled.

Now, what importance should the court give to that fact? I attach considerable importance to the pending norther, and I believe that the fact of its approach is the explanation of the great anxiety displayed by the vessel on the reef. I do not attach much importance to the contention that the Rheems would have arrived there at 5 o'clock on that same day to take her off. The Rheems was a large ship, and not easily maneuvered in such waters. Nor is there any reason to suppose that she would have certainly reached there in time to have finished the operation that day, while it is clear that on the next day she could not have safely attempted to move the vessel.

Nor do I believe the theory of the master of the Brandywine that the norther would have lifted him off the reef. I believe the norther would have more likely dashed him to pieces on the reef than moved him off it. I think the case, then, must be viewed as one in which, had not the Alabama and the El Aguila brought the Brandywine clear of the reef when they did, she would have in all probability suffered heavy damages. Under this view, if the case were not complicated by the question of the actual damage to and loss of time of the Alabama consequent thereon, I should have no difficulty in rendering a reasonable award and apportioning it between the El Aguila and the Alabama. The difficult question of the case is as to what influence the actual damages sustained should have.

I am of the opinion that, in the light of the authorities, which require the court to view with a liberal eye the voluntary efforts of the salvor, the evidence sufficiently establishes that the Alabama received direct damage during and because of the salving operation, and I think it clear that the authorities justify—in fact, require—the taking into consideration in the salvage award the loss and damages sustained by the salving ship. My opinion is that the true rule ought to be that, though a salving ship sustains no damage, evidence of her subjection to peril, danger, and risk increases her reward, and that, when the existence of the danger and peril is made certain by an actual ascertained damage, the court should be guided by the same principles, and should, in awarding a salvage recovery, let the item of recovery due to peril be approximately measured by the actual damage which was sustained.

[6] In short, the only difference is that, while in the one case the probability of damage influences the court to increase the award upon an estimate of the probabilities, the evidence of actual damage should enable the court to fix its award in the light, not of probabilities, but of actualities. Of course, in no case should the salvage award exceed the proper amount of recovery—that is, the benefits bestowed by the service—and no principle should be recognized which would enable a salving ship to recover such a heavy award, due to her own damages, as that the owner of the salvaged ship would be penalized, rather than benefited, by the operation. 24 Ruling Case Law, p. 544, and cases cited; also The Ship Nanna, 14 Ann. Cas. 83, and note.

It is my view, then, that not as a specific allowance, but as influencing it, the loss of the hawsers, the amount of the damage, and the de-

murrage, due to time laid up because of repairs of the damage, should be taken into consideration by the court in fixing the award, and that there should be a total award to the two ships of $45,000. To the El Aguila, which incurred neither danger nor substantial damage, but rendered efficient service, $10,000; to the Alabama, in view of the peril incurred by her, as proven by the damages sustained, $35,000. The amount awarded to the El Aguila to be divided between the crew and the vessel according to the rule prevailing in this circuit, two-thirds and one-third; while as to the Alabama, the danger being to the craft and not to the crew, and the craft having actually sustained loss and damage, it is the judgment of the court that the division between the crew and the Alabama should be four-fifths to the vessel and one-fifth to the crew.