## HUASTECA PETROLEUM CO. v. UNITED STATES.

Circuit Court of Appeals, Second Circuit.
July 2, 1928.

### No. 325.

**1. Salvage ⊚⟹26—Damage to salving vessel, sustained without her negligence, should be considered in determining salvage award.**

Damage sustained by salving vessel without negligence on her part is a proper element to be considered in determining salvage award to be given her, and fact that salved vessel was without fault as respects such damages is immaterial.

**2. Salvage ⊚⟹26—Clear case of negligence of salving vessel is necessary to charge her with her own injuries.**

A salving vessel should be justified in working in dangerous waters without too nice a regard for her own safety, and salving vessel, honestly engaged in work of rescue, should be clearly shown to be negligent before she is charged with her own injuries.

**3. Salvage ⊚⟹48—Evidence held not to sustain finding that damages from running aground of salving tug was result of poor seamanship.**

Evidence *held* not to sustain finding that damages to salving tug as result of being swept aground by strong current while aiding vessel stranded on sand bar, was result of poor seamanship, so as to preclude recovery of such damages as part of salvage award on ground of negligence.

**4. Salvage ⊚⟹48—Presumption in favor of salvage award is strong.**

The presumption in favor of a salvage award is strong.

**5. Salvage ⊚⟹30—$6,150 for services to stranded vessel, valued with cargo and freight at $615,000, by tug valued at $100,000, increased to $12,500 and repair cost.**

Salvage award of $6,150 for services rendered vessel, which with cargo and freight was valued at about $615,000, stranded on a sand bar at entrance to river by tug valued at $100,-000, *held* inadequate, though stranded vessel was in no immediate danger so long as weather held fair, but would have been in great danger in case of hurricane, and in view of success of undertaking, will be increased to $12,500 in addition to cost of repairing damages to tug sustained in salving operation.

Appeal from the District Court of the United States for the Eastern District of New York.

Libel by the Huasteca Petroleum Company, as owner of the salvage tug St. Heliers, against the United States, as owner of the steamship Miskianza, valued with her freight and cargo at about $615,000, for salvage services under a "no cure, no pay," salvage agreement and successful performance thereof in connection with the stranding of the Miskianza between the jetties at the mouth of the Panuco river, Mexico, on August 12, 1924. From a final decree awarding to libelant the sum of $6,150 salvage, libelant appeals. Reversed and rendered.

See, also, 14 F.(2d) 495.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark and Eugene Underwood, Jr., both of New York City, of counsel), for appellant.

Charles H. Tuttle, U. S. Atty., of New York City, and William A. De Groot, U. S. Atty., of Brooklyn, N. Y. (George A. Washington, Sp. Asst. Atty., of New York City, of counsel), for the United States.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

SWAN, Circuit Judge. The Miskianza is a steel tanker of nearly 7,000 tons gross register, of 425.8 feet length and 57 feet beam. While proceeding to sea down the Panuco river, carrying a full cargo of fuel oil, she grounded at 8:55 a. m., on a sand bar between the breakwaters at the entrance to the river. She ran aground gently amidships, being free at both ends. She drew 26 feet fore and aft. When she came to rest, she swung to a northeasterly position, her bow being about 250 feet from the submerged part of the north jetty. She immediately attempted to free herself by using her engines, working astern and ahead. During this operation her heading shifted to southward and her condenser filled with mud, so that the engines could no longer be used. The master then sent a radio for tugs to his Tampico agent, who asked the libelant's superintending engineer for aid. He thereupon ordered the St. Heliers to proceed from her location 16 miles up river to the Huasteca Terminal, close to the jetties. No other tugs were available, and after some delay the master of the Miskianza signed the salvage agree-

ment at 4 p. m. The St. Heliers then passed a 12-inch towing hawser to the stranded vessel and attempted to free her by pulling and rocking. After less than one hour and a half this was given up as useless. She then awaited high tide. At 10:30 p. m. she again began operations, and in a short time succeeded in pushing the Miskianza's stern into the channel. Thereafter the tanker was able to assist with her own engines. The St. Heliers then proceeded to the port bow, intending to push off the bow. While attempting to get into position the strong current swept her toward the north jetty, where her stern grounded. By a hawser sent over and made fast to the Miskianza she succeeded in pulling herself free. She then went to the starboard quarter and soon succeeded in floating the stranded vessel. This was at 12:01 a. m. The Miskianza thereupon proceeded to sea on her voyage.

During all this time the weather was fair, wind moderate, a small sea, and a current of from 3 to 5 miles in the river. The Miskianza was in no immediate danger so long as the weather held fair, but would have been in great danger in case of a "norther." The court found that the season of hurricanes had not yet commenced. The waters in which the St. Heliers maneuvered on the port side of the Miskianza were difficult, because of the freshet current and the presence of submerged rocks washed down from the broken north jetty. The damage sustained by the St. Heliers was repaired for about $4,000. Her value was agreed to be $100,000. The agreed value of the Miskianza was upwards of $500,000, her cargo $100,000, and her freight $15,277.82.

[1-3] One ground of appeal is the failure to allow anything for damage to the St. Heliers by grounding her stern while trying to render assistance to the stranded Miskianza. It is clear that damage sustained by the salving vessel without negligence on her part is a proper element to be considered in determining the award to be given her. The Alabama (D. C.) 280 F. 738, 741, affirmed 288 F. 170 (C. C. A. 5); The Edith L. Allen, 129 F. 209 (C. C. A. 2); The Apalachee, 266 F. 923 (D. C. S. C.); Kennedy v. Crane, 215 F. 897 (C. C. A. 2). The District Court refused it "because the master of the St. Heliers was experienced in those waters, should have known the dangers of the jetty, and such grounding was due to poor seamanship, and not to the fault of the Miskianza."

This conclusion fails to give due account, we think, to the dangers of the conditions under which the tug was working. She was obliged to poke about at night, in very contracted waters, and in a strong current, made stronger by the position of the Miskianza, which deflected it toward her bow. Although her master knew the danger of getting too close to the jetty, still he was obliged to work out of the channel between the stranded vessel and the north jetty, and in the full force of the current. A salving vessel should be justified in working in dangerous waters, without too nice a regard for her own safety. It was while the St. Heliers was trying to get into position to push against the port bow of the steamer that the current swept her down about 100 feet to the point where her stern grounded. While this may have been the result of poor seamanship, we are not convinced of it.

The attempt to connect her grounding with her collision with a fishing boat was not made out to the satisfaction of the trial judge, nor to ours. Apparently the tug was properly about her business when swept away by the current. We think it should be a clear case of negligence, where a salving vessel honestly engaged in the work of rescue is charged with her own injuries. That the Miskianza was without fault in the grounding of the tug is immaterial. The St. Heliers should, therefore, be allowed the reasonable cost of repairs made necessary by her grounding.

[4, 5] Complaint is also made of the decree because the award was only one per cent. of the salved value. It is urged that this is so small as to be "a departure from the path of authority." See The Bay of Naples (C. C. A.) 48 F. 737, 738. In a footnote is given a list of salvage cases cited upon the argument as involving somewhat similar conditions and showing the percentage of the award to the salved value.[1] We recognize that the presumption in favor of a salvage

| | Salved Value. | Award. | Per-cent-age. |
|---|---|---|---|
| [1] The Rajah [De Aldamiz v. The Skogland & Sons (C. C. A.)] 17 F.(2d) 873 | $ 75,000 | $ 5,000 | 6.6% |
| The Silverway [Savannah Sugar Refining Corp. v. Atlantic Towing Co. (C. C. A.)] 15 F.(2d) 648 | 401,000 | 16,850 | 4.2% |
| The Craster Hall (C. C. A.) 213 F. 436 | 497,000 | 24,850 | 5. % |
| The Santa Rose [Grace S. S. Co. v. Merritt & Chapman Derrick & Wrecking Co. (C. C. A.)] 5 F.(2d) 478, 1925 A. M. C. 744 | 744,000 | 36,500 | 4.9% |
| The Apalachee (D. C.) 266 F. 923 | 450,000 | 10,000 | 2.2% |
| The Sahara (D. C.) 246 F. 141 | 400,000 | 12,500 | 3.1% |
| The St. Charles (C. C. A.) 280 F. 334 | 320,000 | 20,000 | 6.2% |

award is strong (The Kanawha [C. C. A.] 254 F. 762, 764; The Cornell [C. C. A.] 15 F.(2d) 375), and we are loath to increase an award made by an able and experienced trial judge. Nevertheless, for reasons already stated, we think there was more danger to the salvor than the trial judge conceded, and therefore, in view of the success of the undertaking and the value salved, the award should be increased to the sum of $12,500, in addition to the cost of repairs.

The decree is reversed, with costs to appellant, for the entry of a decree in accordance with this opinion.