**LAGO OIL & TRANSPORT CO., Ltd.,**
Libellant-Appellant,

v.

**UNITED STATES of America,**
Respondent-Appellee.

No. 59, Docket 23154.

United States Court of Appeals,
Second Circuit.

Argued Dec. 17, 1954.

Decided Jan. 17, 1955.

Kirlin, Campbell & Keating, New York City (Edwin S. Murphy, New York City, and Paul F. McGuire, Bayonne, N. J., of counsel), for appellant.

Warren E. Burger, Asst. Atty. Gen., Washington, D. C. (J. Edward Lumbard, U. S. Atty. for Southern Dist. of New York, and Martin J. Norris, Atty., Department of Justice, New York City, of counsel), for appellee.

Before FRANKFURTER, Circuit Justice, and FRANK and HINCKS, Circuit Judges.

FRANKFURTER, Circuit Justice.

The libel of the Lago Oil and Transport Co. is based upon services rendered to a tanker owned by the United States while in distress outside the port of Aruba, Dutch West Indies. In making an award to members of the crew, which we find no reason to disturb,[1] the District Judge recognized that the services rendered by Lago's tug, the *Captain Rodger*, were "of a salvage nature," but denied recovery to Lago in its own right on the ground that payment by the United States of a bill rendered by Lago constituted a full discharge of whatever obligation resulted from Lago's services.

The tanker, the S. S. *Fisher's Hill*, had caught fire on the evening of April 13, 1947, shortly after leaving Aruba with a cargo of oil. Efforts to extinguish the blaze failed, and the ship's master sent the following message to Lago, which had acted as ship's agent to the tanker while at Aruba:

> "* * * Engine Room Afire Please Rush To Marine Department And Let Them See What They Can Do About Assistance 1910 Abandoning Ship."

The *Captain Rodger* was immediately dispatched to the tanker's assistance. The fire continued to spread and the ship, without motive power, was driven by rough seas toward the nearby coast. Upon arrival, the tug pumped water on the *Fisher's Hill* and, as found by the District Court, "contributed to the control of the fire and helped to prevent its spread." The tug terminated its efforts to extinguish the fire in order to remove the crew from the tanker and from a lifeboat which was dangerously close to the shore, bringing them safely to Aruba. The *Captain Rodger* returned just after midnight to the tanker, at which time the fire was out and the port anchor has been lowered at a point within one mile of shore. The captain of the tug felt that the tanker was nonetheless in danger of drifting in the rough seas and attempted to tow the tanker to a safer position. During this attempt, the *Captain Rodger's* steering gear cut out, causing the tug to foul its tow line and be driven aground and lost. The tanker later was partially repaired at Aruba, and departed in tow for Baltimore on May 7, 1947.

---

1. Through inadvertence, as we understand it, the mate of the vessel was omitted from the award. We assume that the decree will be modified in this respect by the District Court.

At no time was there any discussion between the master of the tanker and Lago's representatives as to the basis of compensation for the services of the *Captain Rodger*. A bill was rendered on May 7, 1947, which included an item of $560 as Lago's agency fee covering, at a per hour rate, the entire period between the first arrival of the *Fisher's Hill* at Aruba and its departure in tow for Baltimore. On May 31, 1947, a bill was rendered for chemicals damaged on the tug while fighting the fire. Certain other bills not here relevant were also rendered, but none related to the services of the *Captain Rodger*. On September 15, 1947, the Government wrote Lago as follows:

"In view of the various insurance claims resulting from the fire aboard the SS *Fisher's Hill*, April 13, 1947, it is extremely important for us to have on hand a complete account of all disbursements directly relating to or arising from said disaster.

"In this connection we would, therefore, appreciate your advice as to whether we have been completely billed for these expenses, or whether supplementary expenses are to follow. If the latter case applies, we would appreciate your billing us as soon as possible."

Lago replied on November 1, 1947:

"As requested in your letter of September 15, 1947, we are enclosing herewith our invoice No. P.H.–1 in the amount of $2,756.60 covering services rendered the S. S. *'Fisher's Hill'* by our Tugs *'Captain Rodger'* and *'Delaplaine'* and our lake tankers *'Missoa'* and *'Tasajera'* during April and May, 1947."

Accompanying this letter was an invoice "For services rendered the s/s *'Fishers Hill'* by the following vessels during April and May, 1947," making charges for the entire time spent by the *Captain Rodger* prior to its loss at a per hour rate of $50, and for ferrying services performed by the other mentioned vessels. This bill was paid by the United States.

■ Since the District Court drew the legal conclusion of accord and satisfaction, the case largely turns on construction of these documents in the setting of their circumstances. To a considerable degree, this in turn depends on the view taken of the relationship of the parties, and the rights and obligations growing out of them, as they existed prior to the payment of Lago's bill. In the absence of any specific provision of the agency contract—and none was shown—the perilous undertakings of the night of April 13 would not constitute a part of the normal obligation of a ship's agent at a port of call. Such a relationship might, as a matter of economic self-interest, be an influence in undertaking unrewarding salvage efforts, and as such may be deemed an element in calculating the amount of the award. But the mere fact that Lago acted as ship's agent for the S. S. *Fisher's Hill* before and after the fire does not preclude an otherwise meritorious claim for salvage, and the District Court found, as we have stated, that "the services rendered by the Captain Rodger and the members of the crew were of a salvage nature." No direct precedent in American law has been called to our attention.[2] In the somewhat analogous case of salvage work by a tug already engaged under contract, the pre-existing

2. Acosta v. The Halcyon, 1 Fed.Cas. page 58, No. 32, while not itself in point, refers to The City of Houston. That case is described as one in which "the permanent agents sent their vessels to assist the property of their principals, which was in distress from a disaster subsequent to the establishment of their agency", and the court indicates that a salvage award was found proper. Id., 1 Fed.Cas. page 62. Although the case is calendared as Federal Case No. 2,755, a notation states that the opinion is not now accessible. 5 Fed.Cas. page 773. No reference to it appears in Judge Marvin's treatise on The Law of Wreck and Salvage (1858) or in Judge Benedict's authoritative treatise, Benedict on Admiralty (1st ed. 1850).

contractual relationship has not been an obstacle to an award where the services were extraordinary in that they were beyond anything reasonably called for by the contract.[3] English admiralty decisions, with which our maritime law as a rule finds itself in accord,[4] "from motives of public policy" recognize salvage claims under these circumstances.[5]

▇▇▇▇▇ The government contends that, in view of the agency relationship, the request for assistance to Lago should be construed as an offer to pay for services at the rates customarily charged by Lago, irrespective of the outcome of the effort to save the ship, and that the contract resulting from performance of services in response to that offer negatived voluntariness essential for a salvage award. The finding of the District Court that the request for assistance was made to Lago "in its capacity as agent of the SS *Fisher's Hill*" is not a finding of fact but an interpretation of the legal meaning of the facts. No doubt Lago would have been entitled to the compensation which it received regardless of whether or not its efforts contributed to the safety of the S. S. *Fisher's Hill*. Yet it is not every contract for payment irrespective of success which will preclude an award. According to *The Camanche,* 8 Wall. 448, 19 L.Ed. 397, "the rule is that nothing short of a contract to pay a given sum for the services to be rendered, or a binding engagement to pay at all events, whether successful or unsuccessful in the enterprise, will operate as a bar to a meritorious claim for salvage." Id., 8 Wall. at page 477, 19 L.Ed. 397. This suggests

that only where the contract entered into is shown to enclose the entire undertaking, will it be a bar to recovery. The circumstances here surrounding the request for assistance do not lead to the spontaneous inference that the parties meant to strike a comprehensive arrangement. The fact that Lago would have received some compensation in any event may well bear on the amount of an award.[6] But to make this conclusive against award would unduly subordinate those "moral considerations and the considerations of policy, which enter largely into the law of salvage."[7] Under such a doctrine, the ship's agent faced with a request for assistance, instead of being encouraged to quick response, would be forced either to forego a just reward or to engage in what might be protracted negotiations when immediacy is demanded.

▇▇▇▇ With this view of the legal situation existing at the time that the Government asked for, received and paid Lago's bill, an analysis of this transaction consistent with the survival of the salvage claim competes in reasonableness with the notion of "accord and satisfaction" adopted by the District Court. The determination of a salvage claim is customarily the business of admiralty; it is not the type of claim which one would expect to be asserted in response to a request for a bill for services. The Government contends that the bill covered the same services that are now made the basis of the salvage claim, and that its rendition and payment is inconsistent with any theory other than that of a settlement of the

3. The Connemara, 108 U.S. 352, 2 S.Ct. 754, 27 L.Ed. 751.

4. See Queen Insurance Co. v. Globe Ins. Co., 263 U.S. 487, 493, 44 S.Ct. 175, 68 L.Ed. 402.

5. Kennedy, The Law of Civil Salvage (3d ed. 1936), 120; see The Kate B. Jones, [1892] P. 366; The Cargo ex Honor, 1 A. & E. 87. Compare Restatement, Agency, § 444; Mechem on Agency (2d ed. 1914), § 1522.

6. The Kate B. Jones, [1892] P. 366. This case is one of a number of English precedents recognizing that a ship's agent rendering salvage services may have a valid claim for salvage despite the fact that compensation irrespective of success was assured under separate agreement. E. g., The Cargo ex Honor, 1 A. & E. 87. See also Admiralty Commissioners v. Valverda, [1938] A.C. 173, 187–188, 203.

7. The Atlas, Lush. 518, 529, reprinted in Ames, Cases on Admiralty, 261, 264.

entire claim, including salvage. But the bill requested and sent is entirely consistent with the Government's present theory that Lago was entitled to this amount under a unilateral contract and, as shown above, this theory is not inconsistent withe the existence of a further salvage claim.

The Government's letter of September 15, 1947, asking for "a complete account," inquiring as to whether "we have been completely billed," and suggesting "billing us as soon as possible" would, on any fair commercial analysis, suggest merely that the Government wished to close out its contractual liability to Lago. The mere introductory statement of the Government's letter expressing concern over insurance claims is insufficient to justify a conclusion that Lago should have known that the Government was asking for a statement of a claim very different in nature and admeasurement from that for which the rest of the letter called. It may be that the Government assumed that Lago was only entitled to a contractual claim and would not have paid the bill rendered had it understood that Lago would also seek a salvage award. And it may also be that the Government would have had little reason to request statement of only a portion of Lago's claims. These considerations would have more weight had not the Government been the moving party in the exchange with a letter which would fail to alert all but the most acute and which seemed to recognize just that theory which Lago now asserts. Even if we attribute to Lago the assumption that the Government would not gracefully concede the right to a salvage award, Lago could reasonably have assumed that the Government was conceding Lago's right to recover at normal rates for its services on a contract basis. Under this assumption, the sole subject matter of the payment

would have been independent of the salvage claim and would not preclude it. The wording of Lago's letter, its delay in bringing this suit for salvage, the nature of the agency bill, covering as it did every hour of the S. S. *Fisher's Hill's* presence at Aruba, give ground for the view that Lago itself intended the bill rendered as an all inclusive statement of its claims. But the countervailing considerations carry greater weight. It is difficult to believe that, even on the most modest estimate of its rights, Lago would not have asserted a claim for the loss of the *Captain Rodger* had it interpreted the Government's letter as a demand for itemizing every claim flowing out of the salvaging episode. While the matter is not free from doubt, the Government had the burden of proof and we do not find that it was carried.

■ In returning this case to the District Court for consideration of the amount of the award, it is appropriate to consider whether the District Court's finding that "loss of the tug *Captain Rodger* was due to unnecessary risk taken by her master" precludes consideration of this loss in determining the award. For the loss as such there can be no recovery. But the mishap is a relevant factor, at least where it did not result from negligence.[8] It is to be viewed as an indication of the risks undertaken in the salvage operation. And at least where the salvor is not frequently engaged in rendering salvage services, there is merit in the view that, where other circumstances justify it, the amount of the loss may be approximated in rewarding the salvor for the perils faced.[9] Of course this is not true where the loss resulted from clearly avoidable risks. On the other hand, too fine a judgment on the wisdom of actions taken in a time of stress should

**8.** Huasteca Petroleum Co. v. United States, 2 Cir., 27 F.2d 734; The Alabama, D.C., 280 F. 738, modified, 5 Cir., 288 F. 170.

**9.** See cases cited note 8, supra. The English cases reach the same result. Baku

Standard v. Angele, [1901] A.C. 549; The De Bay, 8 A.C. 559; The City of Chester, 9 P.D. 182, reprinted in Ames, Cases on Admiralty, 286.

not be allowed to preclude all consideration of the loss.

■ The circumstances here should not produce such a result. When the *Captain Rodger* returned to the S. S. *Fisher's Hill* after delivering the crew at Aruba, it is true that the fire was no longer burning, and the port anchor had been let out. But while the evidence tends to show that the anchor was holding fast, the master of the tug testified that he thought the tanker had been drifting and felt that the rough sea threatened to ground the vessel. He attempted to tow the ship to a safer position. The first effort failed due to the inability of the tug to hold its towing course in the face of heavy wind and seas which carried the tug toward the tanker. The tow rope was cut to prevent collision. This was repeated on the second attempt, but during that attempt the steering gear cut out "for a few minutes." The gear was an hydraulic-electric gear which, when the rudder was subjected to a blow or heavy pressure, ceased to operate. The tug's captain testified that in this instance the heavy seas striking the rudder were responsible, that the failure was not due to any defective condition of the steering gear, and that similar failures had occurred before. Operation was restored by pressing a button located at the main steering gear in the wheelhouse. Since the captain was maneuvering the tug from an auxiliary steering wheel toward the rear of the vessel in order to be able to watch the tow line, he had to run forward 60 feet to the wheelhouse to tell the engineer to press the button, meanwhile stopping the engines for safety. On the third attempt to tow the tanker, the steering gear again cut out. The seas forced the tug down toward the tanker and over the tow rope, which for unexplained reasons had not been cut. To avoid collision, the Captain was forced to start the engines and take the chance of having the propeller fouled by the tow line. This happened, deprived the tug of power, and led to its destruction on the nearby coast.

The evidence that the S. S. *Fisher's Hill* was being firmly held by her port anchor was the predominant factor in the conclusion of the District Judge and of the single expert witness that the captain has taken unnecessary chances. But the captain did not then have the benefit of present knowledge that the tanker's anchor held it in position for many days after the fire. It seems that there was an infusion of hindsight, so difficult to keep out in reconstructing such events, in charging negligence based upon that factor. As stated by this court in Huasteca Petroleum Co. v. United States:

" * * * A salving vessel should be justified in working in dangerous waters, without too nice a regard for her own safety. * * * While this may have been the result of poor seamanship, we are not convinced of it.

" * * * We think it should be a clear case of negligence, where a salving vessel honestly engaged in the work of rescue is charged with her own injuries. * * * The St. Heliers should, therefore, be allowed the reasonable cost of repairs made necessary by her grounding." 27 F.2d 734, 735.

Of course in the determination of the award as a whole and the weight to be given to this loss, many factors are relevant and intertwined in the exercise of this jurisdiction "of a peculiarly equitable character."[10] We confidently leave the matter to the ample discretion of the trial judge.

The judgment of the District Court is accordingly reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

10. The Cargo ex Port Victor, 17 T.L.R. 378, 379, reprinted in Ames, Cases on Admiralty, 281, 283.