Luther BARTHOLOMEW; Zeljko Brcic; Jimmie Haithcock; James Kristovich, Plaintiffs–Appellees,

v.

CROWLEY MARINE SERVICES INC., a Delaware corporation; Union Oil Company of California, Defendants–Appellants.

No. 02–35364.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 5, 2003.

Filed July 30, 2003.

As Amended Sept. 12, 2003.

**1084**

Harold F. Vhugen and Robert M. Kraft, Levinson Friedman P.S., Seattle, WA, for the plaintiffs–appellees.

Terence S. Cox, Cox, Wootton, Griffin Hansen & Poulos, LLP, San Francisco, CA, for the defendants-appellants.

Before LAY,* GOODWIN, and GOULD, Circuit Judges.

GOULD, Circuit Judge.

We consider the apportionment of a salvage award that was given to participating crew members but not to the owner of the salving vessel. The right to a salvage award for saving a ship dates back for centuries. Some have traced the right back to the ancient Rhodians, whose maritime accomplishments began to reach their height in the late fourth century B.C.,[1] and who are thought by some to be the earliest culture to have devised a system of maritime law.[2] The manuscript known as "The Rhodian Sea–Law," which in its extant form has been dated to about 600–800 A.D.,[3] includes provisions awarding "the

---

* The Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit Court of Appeals, sitting by designation.

1. Rhodes began to flourish when it became a stop-over between the East and West in the last quarter of the fourth century B.C. Simon Hornblower & Anthony Spawforth, Oxford Classical Dictionary 1316 (3d ed.1996). After resisting the siege of Demetrius I (also known as Demetrius the Besieger) in 305/04 B.C., the Rhodians built the Colossus of Rhodes, which commemorated their victory. "Rhodes' survival on this occasion increased its prestige and self-confidence, so that throughout the third century, it successfully avoided subservience to any of the larger powers.... By the second half of the [third] century [B.C.], the distinguished Rhodian fleet replaced the Ptolemaic navy as the enemy of piracy on the high seas and as protector of the island communities." Id.

2. Other developed cultures preceding Rhodes, such as Minoan Crete, perhaps had some degree of sophisticated maritime commerce, and so it may be speculated that they, too, may have recognized a principle of salvage right in their customs and laws governing maritime commerce. See Thucydides, History of the Peloponnesian War 1.8.2–3 (T.E. Page et al. eds. & Charles Forster Smith trans., 1919) (describing the process by which Minos of Crete developed a naval empire around 1400 B.C.); see also id. 1.13–14 (describing the Corinthian mercantile naval empire that developed around 700 B.C.). We thank Gaius Stern of the University of California at Berkeley for directing us to this reference but we take responsibility for our speculation. Alas, scholarship to date on this issue peers across the mists of time, constrained by our necessarily curtained ignorance of prior times, no further than ancient Rhodes.

3. See The Rhodian Sea–Law lxxv (Walter Ashburner ed. & trans. 1909) ("[I]n its present form [the manuscript] must date from between A.D. 600 and A.D. 800."). Ashburner

fifth part of what he saves" to one who saves a ship or its cargo, and awarding to the finder of sunken gold or silver one half, one third, or one tenth of its value, depending on the depth from which it was brought up. The Rhodian Sea–Law 117–19 (Walter Ashburner ed. & trans., 1909).[4] Whatever its origin, the doctrine of the salvor's right to be rewarded for voluntary rescue service found its way into Roman law and thence into the Laws of Oleron, the twelfth-century French precursor of English maritime law.[5] 3A Benedict on Admiralty §§ 6, 8 (Martin J. Norris ed., 7th ed.2002). The doctrine of salvage has been part of our admiralty law since early in our nation's history. *See, e.g., Story v. Strettel*, 1 U.S. (1 Dall.) 10, 1 L.Ed. 15 (1764); *M'Donough v. Dannery*, 3 U.S. (3 Dall.) 188, 1 L.Ed. 563 (1796).

■ In expounding this doctrine, the Supreme Court has said that "[s]alvage is the compensation allowed to persons by whose assistance a ship or her cargo has been saved, in whole or in part, from impending peril on the sea." *The Blackwall*, 77 U.S. (10 Wall.) 1, 12, 19 L.Ed. 870 (1869). "[A] salvor is ... a person who, without any particular relation to the ship in distress, proffers useful service and

gives it as a volunteer adventurer without any pre-existing contract that connected him with the duty of employing himself for the preservation of the vessel." *The Clarita*, 90 U.S. (23 Wall.) 1, 16, 23 L.Ed. 146 (1874).

The reasons for giving a salvage award are straightforward: Salvage is "a reward for perilous services, and ... an inducement to seamen and others to readily engage in such undertakings and assist in saving life and property." *The Flottbek*, 118 F. 954, 959 (9th Cir.1902). That incentive structure is preserved by giving an award only where salvage is successful, and by denying one where the salvors would have been paid in any case. And just as the salvors should be rewarded for putting themselves in harm's way to save a ship, it has been held that the owner of the salving vessel should also be rewarded for putting an expensive ship at risk. *See, e.g., The Blackwall*, 77 U.S. at 13, 19 L.Ed. 870 ("Beyond doubt remuneration for salvage service is awarded to the owners of vessels on account of the danger to which the service exposes their property, and the risk which they run of loss in suffering their vessels to engage in such perilous undertakings").

counsels that the manuscript's title should not necessarily be taken at face value: "It is obvious that any learned person who was making a collection of rules of maritime law would be strongly inclined to call his book the Rhodian law, in order to add to its authority." *Id.* at lxviii.

4. Some commentators have misleadingly placed these provisions in Justinian's Digest (or Pandects), in the section entitled "De Lege Rhodia de Jactu" ("The Rhodian Laws of Jettison"). While the Digest does refer to the Rhodians, *see* Dig. 14.2, it does not make specific reference to these provisions.

5. The Laws of Oleron have been characterized as a foundation of the admiralty law of England that was significantly developed by the fourteenth century. Timothy J. Runyan,

*The Rolls of Oleron and the Admiralty Court in Fourteenth Century England,* 19 Am. J. Legal Hist. 95 (1975). The United States, in its admiralty law, borrowed not only from English practice but also from the Laws of Oleron. See, for example, *The Catharine*, 58 U.S. (17 How.) 170, 15 L.Ed. 233 (1854), in which the Supreme Court of the United States adopted the "divided damages" rule in admiralty, as first set out in the Laws of Oleron. This ancient rule was followed in U.S. admiralty law and was not altered until, in 1975, in *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), the Supreme Court overruled *The Schooner Catharine* and adopted a rule of comparative fault in admiralty. This shows, at the least, that the Laws of Oleron have had some staying power in admiralty law. Their impact on salvage law principles continues.

## I

Luther Bartholomew, Zeljiko Brcic, Jim W. Haithcock, and James Kristovich ("appellees") were employed by Crowley Marine Services, Inc. ("CMS") and were crew members on CMS's tug *Sea Voyager* when it was called to the aid of another CMS tug, the *Sea Vixen*, on January 9, 1999, in the Gulf of Alaska. The *Sea Vixen*, pulling a barge with 12,256.81 short tons of urea fertilizer owned by UNOCAL, had caught fire, and the tug's master and crew had been evacuated. The *Sea Voyager* arrived about fourteen hours after being summoned by CMS, and in about an hour, the appellees, acting by direction of their vessel master, attached the endangered tug to theirs by a tow line. During this operation, Bartholomew and Kristovich jumped from their tug to the *Sea Vixen* and back, at what the district court called "grave risk of harm." The *Sea Voyager* pulled the *Sea Vixen* towards Valdez, and a day and a half later, the *Sea Vixen* was transferred to another CMS tug. During the journey, the fire on the *Sea Vixen* burned out.

CMS is a marine transportation company that lists salvage work among the services it offers to its clients. In performing this salvage of the *Sea Vixen*, the appellee crewmen used an "Emergency Tow Package" that was included in the *Sea Voyager's* gear precisely because CMS outfits its ships to do salvage work. CMS billed UNOCAL for routine towing services, but not for salvage work, and neither CMS nor UNOCAL gave any salvage award to the appellees. A clause in the appellees' employment contract provided that "[w]henever the tug or those acting on its behalf waive the rights to claim salvage, such waiver shall be construed as a waiver made on behalf of the crew and shall be binding upon all of its members."

The appellees sued CMS for salvage in district court. The appellees asserted a right to a salvage award for their successful efforts to secure, and bring to safety, the *Sea Vixen* and its barge loaded with UNOCAL fertilizer. CMS defended on an array of grounds, including that the appellees had done no more than perform their duties as employees of CMS, which was engaged in salvage business, and also that CMS's failure to bill UNOCAL for salvage was an effective waiver that applied, through the clause in the employment contract, to the appellees. The district court found to the contrary that the appellees had performed salvage work "of a moderate order," for which they were entitled to an award, and that CMS's failure to bill UNOCAL for salvage did not effect a waiver of the appellees' salvage rights. The district court calculated the value of the *Sea Vixen*, the barge, the fertilizer, and the fuel at $5,664,066, and awarded 5% of that sum to the appellees and to Richard Swain, the master of the *Sea Voyager*. The district court's award allowed no compensation to CMS as owner of the salving vessel.

CMS appealed, arguing: (1) that the appellees were not entitled to a salvage award because they were required under the terms of their employment contract to perform salvage work; (2) that the failure to bill UNOCAL waived any salvage claim; and (3) that if a salvage award were due, then CMS, as owner of the tug that performed the salvage operation, should have a share of the award, and also that all crew members of the salving vessel were entitled to a share of the award, with any unclaimed share accruing to the benefit of CMS as owner of the salvaged vessel.

## II

The crew of the *Sea Voyager* were employed under a collective bargaining agreement ("CBA") between CMS and the Inlandboatmen's Union. The CBA includ-

ed a provision setting out the tasks of "vessels stationed at or regularly assigned to Valdez, Alaska," as was the *Sea Voyager*. The provision stated that such "[v]essels . . . will be utilized to assist tankers and other vessels into and away from the docks, escort vessels and perform all other activities involved in docking and undocking of vessels. They may also be called upon to perform fire-fighting work, oil spill cleanup work, boom deployment and retrieval, and salvage work." The CBA did not otherwise address the appellees' responsibility for salvage work, nor did it specify any particular basis for determining how the appellees would be paid for such work.

As the district court explained, this provision in the CBA, by itself, did not bar the appellees from receiving a salvage award. Although the CBA listed "salvage work" among the many activities that CMS vessels could be "called upon to perform," the CBA made no express provision for CMS employees to perform salvage work. Such a provision is the only way to substitute a seaman's wages for a salvage award. An employer may not bar such an award simply by including "salvage work" among the ship's services, without more.

■ The situation would not differ if the provision quoted above had provided that the seamen, rather than the vessel, could be called upon to perform salvage work. A salvage award would have been barred if the agreement had specified a wage rate that applies whether the salvage operation succeeds or fails. But under our admiralty law, a successful salvage operation will justify an award to the salvors, unless they would have been paid regardless of their success. *See Evanow v. M/V NEPTUNE*, 163 F.3d 1108, 1115 (9th Cir.1998) ("[A] 'no cure, no pay' contract . . . is generally presumed unless the one asserting that the contract displaces a pure salvage claim proves that the contract was payable at

any event.") (citations omitted). If an employer intends that employees will be paid their normal hourly wage for such work, the employment contract must say so expressly. Absent a special provision on remuneration for salvage, the contract cannot negate the policy of giving an award. *See The Camanche*, 75 U.S. (8 Wall.) 448, 477, 19 L.Ed. 397 (1869) ("[N]othing short of a contract to pay a given sum for the services to be rendered, or a binding engagement to pay at all events, whether successful or unsuccessful in the enterprise, will . . . bar . . . a meritorious claim for salvage.") (footnote and citations omitted).

Here, it is uncontroverted that the appellees' job descriptions made no reference to salvage work, and that the appellees were not trained to perform such work. They could not properly have been required by their vessel master to put themselves in danger by jumping from one ship to the other, as they did during the salvage operation. Their services in aiding the *Sea Vixen* were voluntary and they placed themselves at a risk not required by their contract. That the CBA mentioned CMS's willingness to perform "salvage work" did nothing to prevent the crew member salvors from receiving an award.

### III

■ CMS argues that it waived any salvage award when it billed UNOCAL only for towing services, and that the waiver extended to, and was binding on, all crew members because of the waiver provision in the CBA. CMS's failure to bill UNOCAL for salvage was not a waiver of a salvage claim. In *Lago Oil & Transport Co. v. United States*, 218 F.2d 631 (2d Cir.1955), the United States government had received towing services under contract from the appellant, who then also provided emergency salvage services.

10429

The government requested an "account of all disbursements" relating to the disaster. *Id.* at 633. The appellant submitted a bill only for the towing services, and the United States paid the bill. When the appellant later sought to recover for salvage, the United States argued that by billing only for towing, the appellant waived any salvage claim. Justice Frankfurter, sitting by designation, rejected that theory, holding that the bill for towing was "not inconsistent with the existence of a further salvage claim." *Id.* at 635. Here, it would be even harder to construe CMS's bill as a waiver of the right to salvage, because CMS did not assert, when it billed UNOCAL for towing, that the bill covered all expenses associated with transporting UNOCAL's fertilizer.

CMS offers nothing else to show that it waived any salvage claim for itself. Since there was no waiver, the waiver provision in the CBA was never triggered. The district court's conclusion that the appellees were due a salvage award, and that CMS did not waive the award, was not in error.

## IV

In apportioning the salvage award, the district court awarded $100,000 each to Bartholomew and Kristovich, $25,000 to Brcic, $10,000 to Haithcock, and $48,203.30 to master Swain. The district court gave no part of the award to the other two members of the *Sea Voyager's* crew or to CMS.

### A

CMS argues that all crew members should have received some part of the award, and that any waived salvage claim inures to CMS as the salvaged ship's owner. *See, e.g., The Blackwall,* 77 U.S. at 12 ("[T]he non-prosecution by one set of salvors enures, not to the libellants prosecuting the claim, but to the owners of the property saved.") (footnote omitted). We

have said that "[a]ll who render service in a salvage operation may share in an award." *St. Paul Marine Transp. Corp. v. Cerro Sales Corp.,* 505 F.2d 1115, 1117 (9th Cir.1974). The district court found that the two crew members who received no award had not rendered service in the salvage operation. CMS has not shown that the district court's finding was erroneous.

### B

■ But there is another difficulty. The district court denied an award to CMS on the ground that "its only motivation in participating in this salvage was that it owned the Sea Vixen and Barge ... and [would have borne] any loss or damage to these vessels." Because salvage is a reward to those who undertake risks to save ships in distress, it has been considered a general, if not universal, rule that the reward is available not only to the salvors but also to the owner of the salving vessel, if there was a risk that the vessel could be affected during the salvage operation. *See The Blackwall,* 77 U.S. at 13; *The Camanche,* 75 U.S. at 474 ("Remuneration for salvage service is awarded to the owners of vessels, not because they are present, or supposed to be present when the service is rendered, but on account of the danger to which the service exposes their property and the risk which they run of loss in suffering their vessels to engage in such perilous undertakings"); *Browning v. Baker,* 4 F. Cas. 453, 458 (E.D.Va.1875) ("The owners of steamboats especially, which are become so extremely useful and efficient in wrecking operations, and which are structures whose cost is beyond the ordinary means of individuals, are now allowed a liberal share of salvage money.... The salvage is given to the owners of salving vessels in compensation for risking their wrecking vessels in hazardous services."). *See also* Martin J. Norris, *The Law of*

*Seamen* § 9:13 (4th ed.1985) (stating that under English law, "it must appear that the shipowner's property was actually risked or at least in risk of being affected for the owner to share in the award.").

■ This case presents a special wrinkle. The vessel in distress, the *Sea Vixen*, was owned by CMS, which notified another of its own tugs, the appellees' vessel the *Sea Voyager*, of the need for salvage. CMS had fitted the *Sea Voyager* with specialized equipment that greatly aided in the salvage operation. Historically, the owner of the salving vessel has received a significant portion of the salvage award, ranging from as little as one-fifth in cases where the work of the crew was of greatest importance and involved high risks, to as much as nine-tenths in cases where the crew's work was routine and involved little risk, and instead the presence of the salving vessel was most important.[6]

The appellees contend that even if the owner of the salving vessel is normally entitled to a share of the award, there is no reason to create such an incentive when the owner was prompted to participate in the salvage operation to save his own vessel. Thus the appellees argue that CMS already had an incentive to save the *Sea Vixen*, and CMS is not entitled to any further reward. Although this urged exception to the general rule is not wholly implausible, we conclude that it is neither required nor desirable, and hence we disagree.

Our reasons are in part based on statute. 46 App.U.S.C. § 727 provides that

"[t]he right to remuneration for assistance or salvage services shall not be affected by common ownership of the vessels rendering and receiving such assistance or salvage services." This provision makes no distinction between services rendered by the salvors and services rendered by the salving vessel. Any such distinction would lead to the ill-advised result that if both vessels had the same owner, the crew member salvors for the same effort would receive a larger salvage award than they would if the two vessels had different owners. In both cases, the need to provide an incentive to the seamen remains the same. In both cases, the risks to the seamen and their individual contributions are the same. As the conduct is the same in each case, we see no valid basis for a distinction in the statute's application. Our reasons are also based on policies that we believe underlie the salvage law of admiralty. If the salving vessel is put at risk, the owner is normally entitled to a share of the award, and in our view there is inadequate reason to alter that policy when the salvaged vessel belongs to the same owner. The owner using a second ship to salvage a first ship in distress, even if financially interested in the distressed ship, is risking additional assets, in the form of the second ship, to perform salvage.

We find additional support for this view in the precedents on salvage awards in cases of common ownership. In *Lewis v. A Lot of Whalebone*, 51 F. 916 (N.D.Cal. 1892), a barkrigged steam whaler was wrecked in the Arctic Ocean, and some of

---

**6.** For a general range of awards to the salving vessel, see 3A Benedict on Admiralty § 282, at 22–5–22–7 (collecting cases). *See also* Grant Gilmore & Charles S. Black, Jr., The Law of Admiralty 556 (2d ed. 1975) ("In high order salvage, where the individual salvors, under dangerous conditions, show skill, resourcefulness and courage, the crew's share will be upped. In low order salvage, which is just enough more than simple towage to qualify at

all and where the crew has done little the owner will get a larger than usual share. Between the two extremes, recent American cases suggest that the ordinary division is two-thirds to the owner, one-third to the crew.") (footnotes and citations omitted). We express no view whether the ranges thus specified will be applicable on the precise facts of this case to set an award, if any, for CMS. *See infra* note 7.

its cargo was saved by the whaler accompanying it. Parties to the litigation had co-ownership interests amounting to about one-third of the salving vessel and about half of the wrecked vessel and her salvaged cargo. *Id.* at 922–23. After a thorough and insightful review of the case law on salvage where both vessels have the same owner, the district court concluded that "the authorities do not ... eliminat[e] from a salvage service the interests of all persons who may also have some interest in the salved property." *Id.* at 924–25. The court awarded 46.6% of the award to the owners of the salving ship, with the remainder to the officers and the crew. *Id.* at 927. *See also Jacobson v. Panama R. Co.,* 266 F. 344 (2d Cir.1920) (holding that where both vessels had the same owner, it was not an abuse of discretion to give 75% of the salvage award to the owner).

In apportioning the salvage award, the district court should have considered whether CMS, as the owner of the salving vessel, was entitled to part of the award that was set as reasonable salvage by the district court; if the salving vessel was put at risk in any way, then its owner was due some share of the award. The mere fact that the owner had an interest in the ship in distress cannot be a basis for denying the owner a share in the award. In establishing the amount of such award to the owner, the district court has a measure of discretion. Our admiralty law provides that the owner's portion of the award should vary according to the ship's role in the salvage operation. Here, the district court found that the salvage operation lasted about an hour, and was one of a "mod-erate order." It appears that the *Sea Voyager* was able to aid in the operation because it was equipped to perform salvage assistance of the kind rendered here. The record does not tell us either the value of the assets, in the form of the *Sea Voyager,* that were put at risk, or the degree of risk to them in the salvage operation, or the reasonable value of the use of such assets for the period in which the salvage was effected. These, and possibly other factors, will be pertinent to the district court's sound exercise of discretion, in the first instance, in setting a share of the award for the benefit of CMS.[7]

Based on our foregoing analysis, we affirm in part the entitlement of the crew members to salvage, but because CMS, in its capacity as salving vessel owner, was allotted no share of the salvage award, we vacate the district court's judgment on the award. We remand the case to the district court with instructions to hold such further proceedings as the district court deems appropriate, to make findings of fact on the *Sea Voyager's* role in the salvage operation in the respects detailed above and otherwise, and finally to determine what portion of the award, if any, CMS should receive.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.** Each party is to bear its own costs on appeal.

---

**7.** All facts pertinent to determining the salving vessel owner's share have not yet been presented in evidence. And in any event it is for the district court, after due hearing and opportunity of parties to be heard, in the first instance to make an allocation among salvors entitled to an award. Accordingly, we express no opinion on an appropriate determi-nation for the district court to make on remand as to what award, if any, the owner of the salving vessel should receive in this case for placing *its* salving vessel at risk and for the use of the vessel to effect a salvage, except for our holding that CMS's ownership of the salvaged vessel does not defeat CMS's right to a share of the salvage award.